Clifford J. HANCE, Jr., Appellant,

v.

UNITED STATES of America, Appellee.

Bob Neal CARSON, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 16777, 16778.

United States Court of Appeals Eighth Circuit.

Feb. 14, 1962.

David C. Harrison, Salem, Mo., for appellant Clifford J. Hance, Jr., and Dorman L. Steelman, Salem, Mo., was with him on the brief.

Frank B. Green, St. Louis Mo., for appellant Bob Neal Carson, and Morris A. Shenker, Murry L. Randall and Lawrence J. Lee, St. Louis, Mo., were with him on the brief.

J. Whitfield Moody, Sp. Asst. U. S. Atty., Kansas City, Mo., for appellee, and F. Russell Millin, U. S. Atty., Kansas City, Mo., was with him on the brief.

Before VOGEL and RIDGE, Circuit Judges, and GRAVEN, Senior District Judge.

RIDGE, Circuit Judge.

In Case No. 16777, appellant Clifford J. Hance, Jr., appeals from his convictions and sentences for uttering a counterfeit obligation of the United States in violation of Section 472, Title 18 U.S.C.A., and for conspiracy in relation to counterfeiting in violation of Section 371, Title 18 U.S.C.A. In Case No. 16778, appellant, Bob Neal Carson, appeals from his conviction and sentence for the same conspiracy. Appellants having been jointly indicted, tried and convicted by jury verdict, their appeals have been consolidated for disposition in this Court. Appellants will hereinafter be referred to as defendants.

Nine persons, including defendants, were named in a three-count indictment charging substantive offenses and conspiracy in violation of the counterfeiting laws, supra. Each of the defendants designated therein, except Hance and Carson, entered a plea of guilty to one or more of such charges. In these appeals Hance and Carson make no challenge as to the sufficiency of the evidence to sustain their respective convictions, nor as to the rightness of the sentences imposed on them. Their assignments of error relate to procedural matters, i. e. (1) the trial court erred in refusing to permit their defense counsel to make full inspection of all documents and reports of an undercover Secret Service Agent who testified for the Government at their trial; (2) that the trial court erred in refusing to make the grand jury testimony of that agent available to their counsel, and erred in refusing to examine the transcript of that witness' grand jury testimony *in camera* for inconsistency with his trial testimony; and (3) that such court erred by unfairly commenting on the evidence in its charge to the jury. Defendant Carson proffers the additional assignment, that the trial court erred in instructing the jury as to his interest as a witness in his own be-

half in the outcome of the case. The first three assignments supra are stated analogously by appellants in their respective assignments of error. Hence we shall treat with them singularly. Facts appearing in relation thereto will be stated in the course of this opinion.

### JENCKS ACT VIOLATIONS

Secret Service Agent Richard Roth, a Government witness who operated for some time as an undercover agent and made contact with various members of the counterfeiting conspiracy here considered, testified at the trial of defendants. From time to time he refreshed his recollection by referral to a typewritten memorandum prepared from notes made by him during the course of his undercover activities. While testifying, Roth also had in his hands other papers consisting of rough, handwritten notes and copies of other typewritten reports made by him. During the course of Roth's direct testimony counsel for defendant Carson, addressing the trial court, remarked: "It is obvious that the witness is reading from some type of report." Thereupon, counsel for both defendants jointly requested permission of the court to see "those notes at this time." The Court ruled that such request was premature and that counsel would be permitted to see the report "at the proper time." After witness Roth completed his direct testimony counsel for defendant Carson commenced his cross-examination of Roth by asking: "Mr. Roth, did you make any reports in connection with the investigation that you have been testifying about? A. Yes, I did." Thereupon, counsel for defendants, without further examination of witness Roth as to the nature, character, or time when any such reports were made, jointly moved "that the Government supply us with a copy of the reports which Mr. Roth has made." Thereafter, considerable colloquy out of the hearing of the jury (covering thirty-three pages of the transcript of the trial) ensued between court and counsel. Summarily, it may be stated that after

the above broad request was made, counsel for the Government stated:

"Your Honor, the request is rather broad and I believe his testimony which he has offered, probably could be covered in two or more of the reports. I object to the handling of the reports on that broad basis."

The Court then said:

"Well, you will have to produce the various reports that have been made by this witness. If there is any portion of them that is objected to, you must direct my attention to it and state your objection; otherwise the reports that have been made in connection with the investigation are available for inspection and examination of the defendants' counsel."

Counsel for the Government then stated:

"We object to the introduction of these, or the turning of the reports to counsel for the defense because they contain therein references to investigative technique and procedure which, of course, is confidential and were received on a confidential basis which does not refer to or in any way covered by the testimony (sic) of the agent and we object to that extent."

Thereafter, all the documents that witness Roth had in hand while testifying were submitted to the trial court for an *in camera* examination. Counsel for the Government affirmed to the trial court that such instruments constituted all documents and reports made by agent Roth during the three-month course of his undercover activities, and no contention *contra* thereto is made in this case.

During the colloquy between court and counsel, counsel for defendant Carson made the following request to the court:

"Mr. Green: Now, then, at this time I would move the Court to have furnished on behalf of Bob Carson any and all written reports, memoranda, and records, written or dictated, by Mr. Roth, and then also any

and all records or memoranda or reports which are pertaining to, memoranda or reports of Mr. Roth. That is, any additional memoranda or reports which are based upon the original reports of Mr. Roth.

"The Court: Made by whom?

"Mr. Green: Made by anyone, either—in connection with the investigation of this case, and also that we be made available to the testimony of Mr. Roth to (sic) the grand jury; that is, testimony given to the grand jury be made available to us.

"The Court: Your request as to the transcript of the testimony before the grand jury is denied. There has been no showing of any cause why that report should be made available for examination to defendants' counsel or anybody else.

"As to the request for reports made by other persons predicated upon information which may have been provided by Mr. Roth in connection with contemporaneous memorandum made by him, that request is also denied as being *outside of the scope of*—Section 3500 of Title 18."

Defendant Carson's counsel further stated:

"Mr. Green: If the Court please, at this time, in view of the Court's statement, I would advise the Court that the purpose of our asking for this information, all this data, is to determine whether or not there are any inconsistencies in Mr. Roth's testimony, and the basis of such inconsistencies would be written reports he made or, as I have previously indicated, the Grand Jury testimony. Now, if we are deprived of every bit of his testimony (sic) it

would be impossible for us to determine whether or not there is any inconsistency . . . ."

Thereafter, counsel for defendant Hance said:

"If the Court please, at this time and in connection with the request, I would like to make a move (sic) for all reports, not only supplied by the witness Roth but any reports based upon the reports which he may have made; any and all memoranda, either typed, dictated or written in longhand, and also a request for testimony given by the Grand Jury hearing upon which the indictment before us was based. * * * "

"The Court: All right. The same ruling will be made in connection with your request as I have already made in connection with the request of Mr. Green, with the same limitations and the same indications of what my ruling will be."

Thereafter, the trial court noted in the record that the request so made by counsel was most general and in the light of the objection made by counsel for the Government he would make an *in camera* examination of all such notes and memoranda to ascertain whether any parts thereof related to the subject matter of the testimony given by Roth. This, the trial judge did during an overnight recess of the trial.

After such *in camera* review of the material delivered to the trial court, the same was divided into groups and designated by the Court as "Reports A, B, C, D, E, and F." The Government was directed by the Court to deliver to counsel for defendants "Report B" [1] only and to retain all the other documents in the manner and fashion in which the trial court had separated and designated

1. This report contained fourteen (14) single-spaced typewritten pages relating details of activities and conversations had by Roth with various members of the conspiracy. The captions thereof read: "Counterfeiting conversations with Loren Hamby and Bob Carson on August 9–10, 1960, During Undercover Assignment"; "Counterfeiting Conversations with Hamby on August 17 & 18, 1960"; and "Counterfeiting Conversations with Loren Hamby on Undercover Assignment August 23, 1960."

them, for review by this Court on appeal, as provided in Section 3500(c), Title 18 U.S.C. In connection with this appeal, all such documents have been lodged with this Court and we have examined the same for the purpose of determining the correctness of the ruling made by the trial judge.

 As a result of its *in camera* examination, the trial court dictated into the record of this case its findings and conclusions as to each document reviewed by him and the general nature and character of the text thereof. Tersely stated, "Report A" was described by the trial court as follows: It is dated July 25, 1960, it relates entirely to counterfeiting conversations of Virgil Goforth on July 22 and 23, 1960. (We here note that Roth in his testimony at the trial merely stated that in July 1960 he had a general conversation with Goforth when Carson and Hamby were present at Jim's Tavern in St. Louis but "nothing was said along the counterfeiting line at this time" in the presence of Carson and Hamby.) In the words of the trial court: "To the extent that (Report A) relates to conversations with Goforth out of the presence of any of the main conspirators, it is hearsay and has no relation to the actual testimony that the witness (Roth) gave." Our perusal of the first four pages of "Report A" confirms the accuracy of the trial court's description and its conclusion in respect thereto. As the trial court said, "Report A" also contains a part denominated "Counterfeiting Conversations with Loren Hamby and Bob Carson on August 9th and 10th 1960, during Undercover Assignment." The trial court accurately described this document as "a carbon copy—that is largely duplicated by an original copy" of the first part of "Report B" delivered to counsel for defendants, "although it isn't precisely the same—it is a rewrite of the carbon copy that has been attached to the July 22 memorandum to which reference was first made. I have examined it very carefully. The only substantial variation that I can find in it is the deletion of a

reference to what I think might properly be called certain investigative techniques and a reference to activities of another Special Agent or of certain informants who are not otherwise identified. * * * " Nothing contained therein has "any reference to matters that would properly be the subject of cross-examination or that affect in any degree the testimony of the witness" Roth. The next document in "Report A" is titled "Counterfeiting Conversations with Loren Hamby on Undercover Assignment, August 23, 1960." In respect thereto, the trial court found: Page 1 of that document is identical; page 2 is identical except for the deletion of one paragraph (which) made reference to a St. Louis lawyer and should be suppressed" because the same was not "within the scope of the direct examination of witness Roth." As to all the documents contained in "Report A" the trial court found them to be substantially identical with documents in "Report B"; that certain portions of the documents in "Report A" should be suppressed as "not being within the scope of the direct examination" of Roth and as "containing matters that are completely hearsay, as representing conversations with people who are not charged as conspirators in (this) case, and containing certain investigative techniques—that are not required to be disclosed." For that reason "the request for the production of 'Report A' was denied."

From our examination of the several parts of "Report A", we are of the opinion that the trial court's findings and conclusions in respect thereto are factually reasonable and that defendants were not prejudiced by the trial court's failure to deliver that document to counsel for defendants. It is manifestly apparent therefrom that contextually the documents contained in "Report A" cover substantially the same information as is contained in the several parts of "Report B" delivered to counsel for defendants for use in cross-examination of Roth.

"Report C" consists of what was denominated by the trial court roughly as "notes". In respect thereto the trial court found the same to cover first a date, July 22, 1960; also August 9 and 10, 1960; what is obviously a rough draft of the conversations with Hamby on August 17th, 18th, and 20th, and notes of the conference on August 23rd with Hamby. The trial court found: "With the exception of the rough draft of what has been denominated 'Counterfeiting Conversations with Hamby on August 17th, 18th, and 20th' * * * it is almost completely unintelligible to me." The unintelligible part thereof was described by the trial court as "a typical bundle of quick notes that would have been taken by anybody as a preliminary to preparing a contemporaneous report." In respect thereto the trial court concluded that "Section 3500 (did not) require the production of the so-called rough notes unless there is some indication that they contain material that in some fashion is not consistent with the formal report that he (Roth) has prepared and submitted." The trial court found that said rough notes and the other documents contained in "Report C" were "obviously a collection of material from which the report, that is Report B and the Report A was (sic) prepared." The trial court concluded: "In view of its nature and in view of the fact I was unable to detect any inconsistency in what portion of it I could read" delivery of "Report C" was denied defendants' counsel. The record reveals that witness Roth did not refer to "Report C" during his testimony to refresh his recollection. From our examination of "Report C" supra, the finding and determination of the trial court was justified. A more correct description of the first five pages of that document, other than as made by the trial court, is difficult to state. So far as that document is a legible document, it clearly appears to be five pages of field notes, partially illegible due to their hastily hand-written nature, disjointedly phrased, without context because of the frequent use of ideograms designed to refresh the memory of the scrivener, yet conveying as little information as possible to an unintended reader. So far as the legible parts of "Report C" which have been examined by us, we agree with the trial court that contextually they are covered and recorded in "Report B" supra. No data contained in "Report C" appears to be inconsistent with "Report B" or any subject matter of Mr. Roth's testimony as given at the trial of this case.

The District Court found that "Report D" consisted of a group of investigative reports covering the period from July 22 and 23, 1960, through August 25, 1960. Individually considered, the District Court found that the report dated July 25, 1960 covers an investigation on July 22nd and 23rd, dealing with "Virgil Goforth, suspect" of passing counterfeiting notes; that reference is made therein to Hamby and Carson and Junior Tripp, all three of whom are named in the conspiracy count of the indictment in this case. The Court found such document to be a report of investigation technique and statements containing hearsay so far as they relate to conversations with Goforth. The next item contained in "Report D" is dated July 27, 1960. As the trial court found: "It purports to give a status report on the undercover assignment (of witness Roth) for the date of July 26, 1960." As to that document the trial court found and concluded that it was in the same category as that previously described as "it deals with investigation of Virgil Goforth as the suspect." Other reports contained in "Report D" are dated August 1, 1960, covering the period of July 29 to 30, 1960, relating to the suspect Virgil Goforth. As to that document the trial court found and concluded: "It is a report of investigative technique in connection with an undercover assignment, dealing with activities involving Goforth. The only reference to any other persons is as it relates to conversations with Goforth and certain others who are not connected with this indictment." The next document contained in "Report D"

was found by the trial court to be "a report dated August 4, 1960, covering the period from August 1 to August 3, 1960" and that the same "deals with the investigation of Virgil Goforth and refers to certain contacts made with Goforth by persons other than witness" Roth. "Next is a report of August 8, 1960, for the period of August 5 to 6, 1960, dealing with the investigation of the suspect Goforth." The trial court found that the same substantially "refers to an effort made by Goforth and the agent to contact Hamby and Carson, the effort being unsuccessful." The trial court concluded: "It is simply a status report. It gives no information that would lead to the discovery of any admissible testimony so far as these two defendants are concerned. * * * " The next is a report dated August 10, 1960, covering a period of August 9 and 10, 1960. As to that document, the trial court found and concluded: "It is simply a status report in connection with the report previously described" and incorporates "investigative technicalities (sic), and refers to 'attached documents' which are included in Report B." The trial court further found and concluded: "This report of investigative techniques adds nothing to the material that has already been made available" to counsel for defense in "Report B." A report dated August 15 1960, covering the period of August 1 to 13, 1960 was also contained in "Report D". As to that report, the District Court found and concluded: "It is simply a status report to his (Roth's) superiors, referring to certain efforts being made to contact Hamby and Carson without success and referring to certain other contacts made by persons who are not covered by the indictment and, therefore, no testimony has been given" by Roth in respect to the contents thereof. Report dated August 16, 1960, contained in "Report D" was found by the trial Court to be a "status report relating to certain activities and certain conversations between the witness (Roth) and Goforth * * * in regard to their decision to pay off the

note on Loren Hamby's car." As to the context thereof, the trial court found and concluded the same "to report conversations (of) hearsay (matter) not affecting anyone who is covered by the indictment." As to report dated August 24, 1960, contained in "Report D" supra, the trial court found the same to "cover activities on August 23, 1960. It is a status report of a conversation with Hamby. To the extent that it purports to described conversations with Hamby, it is incorporated in the attachment" to "Report B" relating to conversations with Hamby on August 23, 1960. As to that document the trial court concluded: "To the extent that it goes beyond that, the report of investigative technique, hearsay, and other matters should not be disclosed." Further, that in view of the fact that "Report B" referred to the particular conversation above mentioned, "this report is denied as representing duplicitous material." The last document contained in "Report D" was found by the trial court to be a "report dated August 25, 1960, purporting to cover a period from August 24 to August 25, 1960." As to that document, the court concluded the same to be "a status report dealing primarily with persons who are not involved in the indictment and hence hearsay, and in addition to that, it deals with investigative technique and activities not properly available" to counsel for the defense. It was in light of the findings and conclusions reached by the trial court as hereinabove stated, that defendants' request relating to "Report D" was denied.

"Report E", denominated as such by the trial court, was, in the finding of that court, "a report dated August 29, 1960 and covering the period from August 26 to August 27, 1960" and that the same "covers generally the arrest of Loren Baxter Hamby, Virgil Goforth, William Ward Nelson and George Allen Brown, the holding in temporary custody of Bob Neal Carson, with his subsquent release." The trial court concluded that said document was "devoted entirely to an activity technique report"; that "it

contains no information * * * that would be of any assistance whatever in the development of this witness' (Roth's) testimony"; that the same was "a status report of activities in connection with the Secret Service in preparing for the arrest" of persons named therein.

From our examination of reports "D" and "E", supra, it appears that they are "Forms 1588, Field Memorandum Reports," variously reporting the status of Agent Roth's activities to his superiors. It is apparent therefrom that the same were not made "contemporaneously with the making of (any) oral statements" recorded therein. It is true that defendants Hamby and Carson are referred to therein, along with other persons not connected with the conspiracy charged against defendants. As to the latter reference, as the District Court found, the same constitute hearsay matter which does not relate to the text found and contained in "Report B," copy of which was delivered to defendants' counsel; and that the subject matter of such reports does not relate to the subject matter of witness Roth's testimony as given at the trial of these defendants. Our examination of said documents confirms the trial court's appraisal thereof. Said reports contain a brief synopsis of daily "details of investigation" and "undeveloped leads." Manifestly, such documents "contain matter which does not relate to the subject matter of the testimony of the witness (Roth)," and as the trial court said, if he "deleted from this (and similar reports) the material that is otherwise unavailable to you as representing investigative technique, matter of that kind, it would be cut up so bad you could hardly decipher it because it represents a summary of his activities and conversations with Hamby and is so interlarded with the two that this material here ('Report B') is much more legible and available" to counsel for defendants. So far as reports "D" and "E" may be said to have some identity with Roth's testimony given at the trial of this case, it is manifest that the sub-ject matter thereof is fully set forth in "Report B" above mentioned.

As to "Report F": The same is a letter dated April 19, 1961, addressed to the Chief Probation Officer of the Western District of Missouri, signed by one Howard R. Haas, Special Agent-In-Charge, giving a resume of the nature of the conspiracy as to which Loren Hamby, et al. had entered a plea of guilty. Manifestly, that document is not a "statement" within the ambit of Section 3500(e), supra and nothing contained in the record in this case reveals that said document was "signed or otherwise adopted by" Roth.

In light of the manner by which this "Jencks Act" question is submitted in this appeal, it should be here noted that counsel for defendants do not assert or claim that any testimony given by Roth as a Government witness is not to be found within the text of the memorandum "Report B" made available to them by the trial court. Also, that the record as made at the trial does not reveal that counsel for defendants in their cross-examination of witness Roth undertook to reveal any contradiction or discrepancy between his testimony as given and the context of the memorandum "Report B" which is all that Roth used to refresh his memory while testifying as a witness.

"It is true, as (defendants) argue, that only the defense is in position to determine the precise uses that may be made of demanded documents (under Section 3500, Title 18 U.S.C.A.) * * * but that is not to say that the harmless error rule is never applicable in respect to the nonproduction of demanded documents." Killian v. United States, No. 7, October Term 1961, 82 S.Ct. 302, (Par. added.)

In the course of the above opinion the Supreme Court confirmed its ruling made in Rosenberg v. United States, 360 U.S. 367, 371, 79 S.Ct. 1231, 3 L.Ed.2d 1304, as follows:

"We there said: 'Since the same information that would have been afforded had the documents been given to defendant was already in the possession of the defense by way of the witness' admissions while testifying, it would deny reason to entertain the belief that defendant could have been prejudiced by not having had opportunity to inspect the letter.' "

In disposing of the "Jencks Act" claim of error made in the Killian case, supra, the Court further said:

"If it is true, as the Solicitor General represents, that the information contained on the two Ondrejka receipts had already been given to petitioner in Ondrejka's narrative statements covering the same subjects, it is clear that the District Court properly could find that the error in failing to produce those two receipts was harmless."

The intimated ruling that might have been made by the District Court in the Killian case, is in effect what the District Court did in the case at bar. In this case Judge R. Jasper Smith (recently deceased) with considerable judicial acumen held a hearing out of the presence of the jury but in the presence of defendants and their counsel, confined to the issues raised by defendants "demands for production of statements and reports of witnesses" under the so-called "Jencks Act" as contemplated by the Congress. At that hearing, counsel for defendants made demands for production of statements far more "broad" than they were entitled to under the "Jencks Act." Under that statute a defendant has no right to examine all reports and statements related to a Government witness. The "statements" required to be produced thereunder are such "which relate to the subject matter as to which the witness has testified." Only "(i)f the entire contents of any statement relates to the subject matter of the testimony of the witness" is the court required to "order it to be delivered directly to the defendant for his examination and use." Nevertheless, in the case at bar, Judge Smith *in camera* made an examination of all the statements demanded by defense counsel. Thereafter, he made "findings of fact" in respect to all such documents and the issue raised by defendants' "Jencks Act" demand. His "finding may not be set aside unless, from a survey of the record, we are convinced that it was clearly erroneous." United States v. Abel, (2 Cir. 1958) 258 F.2d 485, 494, aff. 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668, reh. den. 362 U.S. 984, 80 S.Ct. 1056, 4 L.Ed.2d 1019; cf. Davis v. United States, 328 U.S. 582, 593, 66 S. Ct. 1256, 90 L.Ed. 1453. Under the circumstances revealed by the record in this case, we cannot say that the findings of fact as made by the trial court are clearly erroneous, because defendants' counsel received and obtained from the Government "Report B", which was in effect a transcript of all that was factually stated in reports "A", "C", "D", "E", and "F", supra, so far as those "reports" contain subject matter relating to the testimony given by the Government's witness Roth in this case. Therefore, the court below committed no reversible error in withholding reports "A", "C", "D", "E", and "F" from defendants' counsel. Karp v. United States, (8 Cir. 1960) 277 F.2d 843. If it might be considered that any error was committed by the District Court in this case, surely it could not be anything more than harmless error under the circumstances here revealed. Such is not sufficient to upset the jury's verdict in this case. Rosenberg v. United States, supra; Killian v. United States, supra. As we view the record here, what Judge Smith did by withholding Reports "A", "C", "D", "E", and "F", supra, from defendants' counsel, was to "excise" from the "statements" that Roth held in his hands while testifying, that portion of the totality thereof "which (did) not relate to the subject matter of (Roth's) testimony (as a) witness", after making an *in camera* examination of such reports as he was authorized and required to do under Section 3500(c), supra. (Cf.

Travis v. United States, (10 Cir. 1959) 269 F.2d 928, (reversed on venue question) 364 U.S. 631, 81 S.Ct. 358, 5 L.Ed. 2d 340.) Surely, if a "portion" of a statement may be excised "an entire statement can be refused when it does not relate to the" subject matter of a witness' testimony. Sells v. United States (10 Cir. 1958) 262 F.2d 815, 823, cert. den. 360 U.S. 913, 79 S.Ct. 1298, 3 L.Ed. 2d 1262; Papworth v. United States, (5 Cir. 1958) 256 F.2d 125, cert. den. 358 U.S. 854, 79 S.Ct. 85, 3 L.Ed.2d 88, reh. den. 358 U.S. 914, 79 S.Ct. 239, 3 L.Ed. 2d 235.

### GRAND JURY TRANSCRIPT

■ During the *in camera* examination above mentioned, counsel for defendants, without establishing any "particular need" therefor, made a simple request that witness Roth's "testimony given to the Grand Jury be made available to us." Such request was denied by the court below. Defendants' counsel then requested the trial judge to examine the grand jury testimony of the witness *in camera* to "determine whether or not any statement has been made by Mr. Roth at the Grand Jury hearing that would be inconsistent with or at odds with the testimony he has given here today." The District Court refused to make such examination. This Court has recently ruled, in Berry v. United States, (8 Cir. 1961) 295 F.2d 192; and Brilliant v. United States (8 Cir. 1962) 297 F.2d 385 No. 16806, that under circumstances similar to those appearing in the instant case a trial judge does not abuse his discretion in refusing to examine the grand jury testimony of a witness for possible inconsistencies when no particular need is shown for such examination. What is there said on that subject need not be repeated here. It is sufficient to say that "we do not believe that the defendant(s) met the burden of showing a 'particularized need' for the grand jury testimony (of Agent Roth) or that (they) suffered any prejudice as a result of such testimony not being made availa-

ble to them." (Cf. United States v. Giampa, (2 Cir. 1961) 290 F.2d 83.)

Grand jury transcripts, of course, do not come within the purview of Section 3500, Title 18 U.S.C.A. Pittsburgh Plate Glass Company v. United States, (1959) 360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed.2d 1323, reh. den. 361 U.S. 855, 80 S.Ct. 42, 4 L.Ed.2d 94; United States v. Angelet, (2 Cir. 1958) 255 F.2d 383; United States v. Zborowski, (2 Cir. 1959) 271 F.2d 661; United States v. Kirby, (2 Cir. 1960) 273 F.2d 956; United States v. Annunziato, (2 Cir. 1961) 293 F.2d 373.

### CHARGE TO JURY

■ In the course of its charge to the jury the trial court made the following comment:

"Ordinarily in charges of this kind I do not make a practice of selecting one witness and commenting about that one witness, but if you will bear with me—and you understand that you are not bound by this comment—in view of the turn that has been taken in connection with the witness Roth, I feel obliged to make some specific comments.

"In my view—and you are not bound by this, you understand—in my view the witness Roth is a brave, and exceedingly brave, dedicated public servant, who had demonstrated more courage in the activities engaged in by him than I ever had, who does not deserve the label of 'liar', and who, in my analysis of this (sic) testimony, has given no faint, slight warrant or justification for the label 'liar'.

"Now, Ladies and Gentlemen, you are—and you should if you disagree with me—entitled to disregard that comment, but I feel that it is important that that (sic) be made in order that the record may be straight from my view."

Defendants claim that by such comment the trial judge "did two things: the

court became a witness as to a matter not in evidence, the courage and bravery of Roth, and the court threw the weight of his own character behind the witness Roth by saying that Roth had more courage than it ever had." As a consequence, defendants claim such comment constitutes more than a mere judicial expression of opinion by the trial court and it partook of a partisan argument on the part of the court so that the jury was unduly influenced to render a verdict of guilt against them, thereby denying to them a fair and impartial jury trial. In any consideration of asserted error because of comments made by a trial judge either during the course of trial, or in its charge to the jury, it is essential that the setting of such incident be accurately and fairly portrayed in relation to the tableau of the trial as it appeared before the jury. As this Court pointed out in Stoneking v. United States, (8 Cir. 1956) 232 F.2d 385, cert. den. 352 U.S. 835, 77 S.Ct. 54, 1 L.Ed.2d 54; 354 U.S. 941, 77 S.Ct. 1406, 1 L.Ed.2d 1540, reh. den. 355 U.S. 852, 78 S.Ct. 78, 2 L. Ed.2d 61:

> "In considering the effect of a challenged portion of a court's instruction to the jury, this court must view the charge in its entirety to determine whether or not the jury could have been misled by the portions to which objection has been made. Myers v. United States, 8 Cir., 1927, 18 F.2d 529, 530. So here, if we view only the particular portions of the charge objected to, fault might be found; but when viewed in the light of the court's remarks which immediately followed the objected-to portions, we find no reason for criticism, and must conclude that the jury was not confused by the instruction and that taken as a whole it was not improper." (1. c. 389).

To rightly perceive and correlate the above comment of the Court to the trial of these cases, it should be kept in mind that before Roth's appearance on the witness stand, nineteen (19) other witnesses had testified for the Government, including four (4) who were charged as co-conspirators along with these defendants. Those four others had then entered pleas of guilty but had not been sentenced. Before Roth testified as a witness the Government's evidence generally had then established that Hance was the passer of a $20.00 counterfeit bill. That bill, along with many other counterfeit bills, had been exhibited before the jury. One Loren Hamby who testified for the Government was established by his own admission and other competent evidence as being one of the dominant characters in the conspiracy charged. During the existence of such conspiracy, Hamby was shown to have been an employee of appellant Carson. Roth as an undercover agent first made contact with Hamby. The testimony of Agent Roth delineated numerous conversations had with Hamby and Carson about counterfeiting operations which established Carson to be another dominant figure in the conspiracy charged. It is a fair inference and one can *a priori* conclude from all the evidence in this case, that Roth, while acting as a Secret Service Agent, took considerable chance on several occasions of revealing his identity to some members of the counterfeiting ring. Notwithstanding, it is reasonable to assume from the evidence that Roth doggedly pursued and courageously carried out his undercover assignment in bringing to light the counterfeiting conspiracy in question. It is not sophistry for one to reason that those engaged in a counterfeiting ring are not persons who act with compassion or docility toward one in their presence if disclosed to be an undercover agent, attempting to reveal their conspiracy to the United States authorities.

In the above setting, counsel for defendant Carson in his summation before the jury undertook to verbally flay, denounce and censure Roth as a witness for the Government. He referred to him as "a guy like Roth"—"Mr. Roth is a neurotic. He isn't the man who is worthy of belief, so beyond reproach, that

you can accept his testimony. He has been proved to be a liar in this case over and over again.—Do you remember how anxious he was to convict. He is not an impartial witness. He is an advocate in this case. He is the Government's advocate in this case.—You cannot believe him because they themselves proved him out to be a liar in their own case. Then Mr. Steelman (counsel for defendant Hance) proved him to be a liar and Mr. Hance proved him to be a liar. * * * " During the course of his summation counsel for defendant Carson labeled Roth a "liar" seven times. The premise claimed for such labeling is that Carson and Hance as witnesses in their own behalf denied any connection with the counterfeiting conspiracy; that Loren Hamby, who testified for the Government, testified that Carson was not a co-conspirator, while Roth had quoted Hamby at length, deeply incriminating Carson; and because Roth testified that in June, 1960, when a raid on Hance's farm was made by Government and State law enforcement officers, two dogs and Hance's motor car, shown to have been used in transporting a camera that was a part of the counterfeiting paraphernalia used in the conspiracy, were not taken from the farm by someone. As to the latter subject matter, Roth's statement was, "I don't know when some items were taken, but I understand some items were taken from that farm but I don't know when they were taken and I don't know what they were." Fairly considered, there is no testimony in the record in this case from which a reasonable-minded person could conclude that Roth was the deliberate "liar" that counsel in this case undertook to label him in their closing arguments. Only one incident concerning Roth's testimony and that in relation to the raid on Hance's farm, was seized upon by counsel for defendant to disparage Roth's testimony and classify him as a "liar" before the jury. The only other contradiction of Roth's testimony was that of a denial by Hamby, of Carson's participation as a member of the conspiracy and Hance's and Carson's personal denial of participation. Such contradictions do not spell out perjury from any concept of that term.

It is true that the conviction of defendant Carson largely depended on the testimony of Roth as a witness in this case, but not wholly so. Carson as a witness on his own behalf admitted that at one meeting where he, Hamby, Goforth and Roth were present, a conversation took place in which there was "a discussion about a press" and they (Hamby, Roth and Goforth) were discussing in Carson's presence "something about a press and appropriating some money for this press and they asked me at that time if I would put up some money. I said, 'Gentlemen, if you don't mind I will get out of the car now.'" However, it does not appear from his testimony that he did so, notwithstanding that he also admitted from the witness stand that at that meeting "They were more or less discussing this counterfeit money." True, defendants Hance and Carson denied that they were co-conspirators in the counterfeiting conspiracy charged against them, but it is reasonable to say from facts appearing by their own testimony as witnesses in this case, that Roth's testimony had substance of verity that would prompt the trial court to make the comment supra.

At the commencement of the trial of this case the trial judge cautioned the jury as follows:

"THE COURT: Ladies and Gentlemen of the Jury, one of the very necessary parts of every lawsuit is what we refer to as lawyer's opening statements. These statements are given by the attorneys for the respective parties outlining what they expect the evidence to show. Those statements give you the broad outline of the lawyers' views so that, as the evidence comes in in little pieces, it is sometimes easier for you to fit in the overall pattern. I want to caution you, however, that opening statements by lawyers are not evidence and may not be considered

by you as evidence. They simply are the opinions of the lawyers as to what they expect the evidence to be and are no more binding on you than any opinion that I might express, for example, because, as you have been told earlier and as you will be told again, you are the sole judges of what the facts are and you are not bound by the opinions of the lawyers or by the opinion of the Judge. You base your decision on the evidence as it is presented in the way of witnesses on the witness stand and exhibits such as may properly be admitted in evidence."

During the course of the trial and in its charge to the jury the trial judge in this case admonished the jury numerous times that statements made by counsel expressing opinions and conclusions as to certain evidentiary matter were not binding on the jury; and in the course of its charge the court clearly and emphatically stated nine (9) times that statements made as to his remembrance of facts, or opinions expressed in relation thereto, were not binding on the jury and that they, and they alone, were the triers of the facts and their conclusions and remembrance of the facts should not be influenced by any opinions expressed by the court.

It is in the above setting that the statement of the court hereinabove set forth must be legally weighed. We are of the opinion that defendants have not, under the facts of this case, sustained the burden of establishing that one isolated statement, and that taken out of context, made by the trial court in its charge to the jury constitutes reversible error. Fairly considered, the record in this case establishes that the charge to the jury, as a whole, was fair, dispassionate, and judicially stated and that the trial court cannot and should not be convicted of "partisan argument or advocacy," or appealing "to passion or prejudice" before the jury. The trial court, while expressing an opinion on a subject injected into this case by counsel for defendant, not fairly inferable from the record, properly expressed his judicial opinion thereon as he had a legal right to do. Hence no reversible error was committed by the trial court as claimed by defendants. Cf. Myres v. United States, (8 Cir. 1949) 174 F.2d 329, cert. den. 338 U.S. 849, 70 S.Ct. 91, 94 L.Ed. 520; Callanan v. United States, (8 Cir. 1955) 223 F.2d 171, cert. den. 350 U.S. 862, 76 S.Ct. 102, 100 L.Ed. 764; Segal v. United States, (8 Cir. 1957) 246 F.2d 814, cert. den. 355 U.S. 894, 78 S.Ct. 269, 2 L.Ed.2d 192; Rosenbloom v. United States, (8 Cir. 1958) 259 F.2d 500, cert. den. 358 U.S. 929, 79 S.Ct. 315, 3 L.Ed. 2d 302.

### INSTRUCTION AS TO CARSON'S INTEREST IN THE OUTCOME OF THE CASE

Defendant Carson's claim of error with reference to the court's instruction as to his testimony as a witness and directing the jury's attention to his "interest in the outcome of the trial" is wholly without merit. See Foley v. United States, (8 Cir. 1961) 290 F.2d 562 and cases there cited.

Affirmed.