**UNITED STATES of America**

v.

**Eugene James ALLEGRUCCI, Appellant.**

**No. 13684.**

United States Court of Appeals
Third Circuit.

Argued Jan. 8, 1962.

Decided Feb. 21, 1962.

Rehearing Denied March 22, 1962.

**812**

Stanford Shmukler, Philadelphia, Pa., for appellant.

Daniel R. Minnick, Asst. U. S. Atty., Scranton, Pa. (Bernard J. Brown, U. S. Atty., Scranton, Pa., on the brief), for appellee.

Before BIGGS, Chief Judge, and GOODRICH and GANEY, Circuit Judges.

GOODRICH, Circuit Judge.

This is an appeal from a judgment of conviction under 18 U.S.C. § 659 for possession of goods stolen from interstate commerce, knowing them to be stolen. The goods in question were a Bell & Howell motion picture projector and two Rolleicord cameras.[1] The case has been here before and was sent back for a new

trial because of what the Court found to be erroneous instructions to the jury. United States v. Allegrucci, 3 Cir., 258 F.2d 70 (1958).

■ The appellant first argues that the evidence in the case is insufficient to sustain the conviction. The statute is a technical one and requires the Government to prove the allegation that the goods were stolen from one of various enumerated places.[2] Here, the indictment charged that the goods had been stolen from Railway Express Agency platforms, to which they had been delivered by employees of the express company. This Court, upon the prior consideration of the case, said:

> "There was ample evidence from which the jury could have found in this case that the goods involved in the indictment * * * were stolen from the platforms on which they had been placed in the course of movement in interstate commerce * * *."

The goods were shipped from New York City to points in West Virginia, Texas and Florida. They were not received by the consignees and the Government's theory is that they were stolen from the platforms of the Express Agency in the Long Island City Terminal and the Eleventh Avenue Terminal, respectively. The defense claims that at the second trial there was evidence which showed conclusively that the goods were not stolen from either platform of the Express Agency but were regularly forwarded into the channels of interstate commerce. If this testimony—by two

1. At the time this case arose, the retail price of the Bell & Howell projector. was $734.00 and the wholesale price $489.33. The Rolleicord cameras each sold at retail for $149.50, while their wholesale prices were $81.85 and $86.13, respectively.

2. In pertinent part, 18 U.S.C. § 659 reads: "Whoever * * * steals * * * from any railroad car, wagon, motortruck, or other vehicle, or from any station, station house, platform or depot or from any steamboat, vessel, or wharf, or from any aircraft, air terminal, air-

port, aircraft terminal or air navigation facility with intent to convert to his own use any goods or chattels moving as or which are a part of or which constitute an interstate or foreign shipment of freight or express; or

"Whoever buys or receives or has in his possession any such goods or chattels, knowing the same to have been * * * stolen; * * *

* * * * *

"Shall in each case be fined not more than $5,000 or imprisoned not more than ten years, or both * * *."

drivers of the Express Agency—thus showed that the goods were not stolen from the platforms and the jury accepted the testimony, then the specific crime for which the defendant was indicted has not been committed. Each driver concerned told of his delivery of the article in question to the platform. Neither got a receipt upon the delivery of the package. We do not see from the testimony that the "sorting room" which the drivers talked about under skillful examination by defendant's counsel is any separate and distinct room on either of the station platforms. The photographs introduced —so far as they show anything—seem to show that the "sorting area" is just a part of the general loading and unloading platform. Because the argument is pressed with some vigor, we set out in Appendix I to this opinion the full testimony concerning this point as it was given to us by the defendant. Our conclusion from the testimony is that, taken most favorably to the defendant, it is inconclusive and certainly nothing upon which a court should take the question of theft from the platform away from the jury.

The appellant stresses vigorously and we have considered carefully the attack upon the trial court's handling of memoranda under the so-called Jencks statute, 18 U.S.C. § 3500. There are two of these memoranda. We shall consider first the one having to do with the witness Zippittelli. She is a young woman who was in and about the Allegrucci household because she assisted in the care of the defendant's ill mother. After an F.B.I. agent talked with her he wrote down what was described as a summary of his conversation. She did not see or adopt the memorandum nor did it purport to be a full, substantially verbatim account of what she said. We could stop discussion of this point forthwith because the memorandum is not the type described by the statute in subsection (e) (2).[3] The trial judge, however, after examining the memorandum *in camera*, read it to counsel for the defense. Miss Zippittelli's testimony in court was completely consistent with the agent's report of the interview. A comparison of Miss Zippittelli's statement and her testimony is set out in Appendix II. Furthermore, it was highly favorable to the defendant because

3. Subsection (e) (2) subjects to the provisions of the statute any statement which is

"a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness [called by the United States] to an agent of the Government and recorded contemporaneously with the making of such oral statement."

F.B.I. "Interview Reports," similar to the one made by the agent of his interview with Miss Zippittelli, have been the subject of much debate as to whether and when they are producible statements either under subsection (e), (1) or under subsection (e) (2). See, e. g., Campbell v. United States, 365 U.S. 85, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961), where the witness testified that he "thought" the agent wrote down what he said and that he might have read over his statement and told the agent it was accurate; United States v. McKeever, 271 F.2d 669 (2d Cir. 1959), where notes were made contemporaneously with the interviews and where the substance of the inter-

viewees' remarks was set out, occasionally in quotation marks. In these circumstances, Palermo v. United States, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959), directs the trial judge to seek extrinsic evidence—either by calling witnesses on his own motion or by requiring the Government to produce them—to ascertain whether the statement in question falls within the purview of the statute. See Campbell v. United States, supra, 365 U.S. at 96, 81 S.Ct. at 427. No such situation, however, is presented here. There was no testimony by the witness Zippittelli that she saw or in any other manner approved the statement; there is no indication that notes were taken during the interview; the statement does not purport to be more than a mere summary. In the absence of *any* preliminary showing by the defense that the report *might* be producible under the statute, we cannot see that even Campbell requires the trial judge to delve extrinsically and on his own motion into the circumstances surrounding the interview.

the young lady said that the cameras exhibited as the stolen goods were not the cameras which she saw in defendant's home. We see no error in the conduct of the trial judge in giving counsel more than he was entitled to.

■ The second objection refers to a memorandum made by Government Agent Roberts after an interview with the defendant himself. The point urged is that, after Agent Roberts testified to the substance of an interview with the defendant on July 15, 1955, the trial court should have ordered the production of a memorandum which the agent made of the meeting. He bases this on subsection (e) (1) of the Jencks Act, cited above.

The facts of this case on this point are almost indistinguishable from those of United States v. Annunziato, 293 F.2d 373 (2d Cir. 1961), with which we agree. While Annunziato concerned the production of a statement requested under subsection (e) (2), its holding is equally applicable here where the basis of the request was subsection (e) (1) of the statute. In reaching its conclusion that the failure to order production of the statement was harmless error, the Second Circuit, through Judge Friendly, said:

"Careful scrutiny of the Interview Report convinces us that on no basis could it have assisted the defense. Both the majority and the minority opinions in Rosenberg v. United States, 1959, 360 U.S. 367, 371, 375, 79 S.Ct. 1231, 1236, 3 L.Ed.2d 1304, spurn the extreme view 'that the harmless error doctrine can never apply as to statements producible under the statute * * *.' Even taking as our test the presumably more rigid standard laid down by the minority in Rosenberg * * * that we must remand 'unless the circumstances justify the conclusion that a finding that such a denial [of a statement producible under § 3500] was harmful error would be clearly erroneous,' we answer that here it would be, fully recognizing, as we say this, the caution that 'appellate courts

should be hesitant to take it upon themselves to decide that the defense could not have effectually utilized a producible statement.' The Interview Report checks fully with Haas' trial testimony. Had we been defense counsel, we would have bitterly regretted receiving it, since its production would have presented the dilemma, which trial lawyers strive desperately to avoid, that examination on the report would only reinforce the witness' testimony whereas failure to use it would do the same."

In this case, the contents of the report prepared by Agent Roberts as to his interview with the defendant are nearly identical with Roberts' testimony on direct examination as to the substance of the interview. A comparison of the memorandum with Roberts' testimony is set forth in Appendix III. In these circumstances we cannot see how the failure to order production of the report was anything but harmless error.

■■ The appellant next complains of that portion of the charge which had to do with possession of stolen goods and the possible inferences to be drawn therefrom. The court charged:

"Unexplained possession of recently stolen goods permits the jury to infer, if they decide to infer or want to infer, that the possession is guilty possession * * *.

* * * * * *

"Possession of the fruits of crime, recently after its commission, may justify the inference that the possession is guilty possession, and, though only prima facie evidence of guilt, may be of controlling weight unless explained by the circumstances or accounted for in some way consistent with innocence. * * * "

The defendant argues that the term "recently stolen goods" was not sufficiently explained. There was no request, at the time of the charge, for further explanation. The evidence shows that the cameras in question were in the pos-

session of the defendant about December 7 or 8, 1954, and the dates of shipment were, respectively, September 22, 1954, and November 24, 1954. The motion picture projector was shipped in interstate commerce December 8, 1954, and sold in March of 1955. We think that there is no substance to the point that the interval between the shipment and the defendant's possession took the case out of the classification of "recently stolen goods." Of course, there is no set period which constitutes recency in this connection.[4] Under any standard, however, we think the intervals here were not too long.

■ The appellant also complains that the jury was prejudiced because in its presence the trial court, in discussing with defendant's counsel the latter's application for a copy of the memorandum prepared by Agent Roberts, asked counsel whether "the doctrine of completeness" would apply if he were given the memorandum. The court suggested that counsel think it over. And counsel replied: "We have nothing to hide." All of this talk about the doctrine of completeness may have confused the jury as it has the Court, but it certainly is nothing that could have prejudiced the defendant in any way, especially since his counsel really testified in his favor by saying that there was nothing to hide.

■ There was one point, however, to which the Government concedes that the defendant's position is well taken. Before sentencing the defendant, the court told his counsel to "go ahead." But the court did not specifically ask the appellant if he had anything to say and, in fact, did not give him a chance to say it had he wished to. Under Green v. United States, 365 U.S. 301, 81 S.Ct. 653, 5 L.Ed. 2d 670 (1961), the convicted defendant should have had this opportunity.

Therefore, the judgment of the district court will be vacated and the case remanded for re-sentencing, giving to the defendant the opportunity to make a statement before sentence is imposed upon him.

## APPENDIX I

William Beaton, under cross-examination, testified as follows:
"By Mr. Kossman:
"Q. Did you get a receipt for the merchandise you say you placed on the platform?
"A. I got a receipt for the packages when I picked them up and turned them into the Railway Express at nighttime.
"Q. Where did you get the receipt for the packages?
"A. From Burleigh Brooks.
"Q. I mean——
"A. (Continuing) I don't get no receipt when I take the load to the terminal.
"Q. When you placed them as you say on the platform did you get a receipt from anybody?
"A. No, sir, no receipt.
"Q. Do you know how long it remained on the platform?
"A. I wouldn't even know.
"Q. Did you see any one take it off the platform?

---

4. The dogma as to what constitutes "recent" possession of illegally obtained goods is that the term is not capable of exact or precise definition, that the concept of what is "recent" varies with the circumstances of each particular case, and that the question is one of fact solely for the jury. See, e. g., Chambliss v. United States, 218 F. 154, 158 (8th Cir. 1914). However, for what it is worth, in People v. Malin, 372 Ill. 422, 24 N.E.2d 349 (1939), possession six weeks after theft was held to be not so remote in time as to remove the case from the consideration of the trial court sitting without a jury; State v. Jenkins, 213 S.W. 796, 799 (Mo.1919), said that the period could be as long as two years. And see especially State v. Giordano, 121 N.J.L. 469, 3 A.2d 290 (Sup.Ct. 1939), holding valid a statute providing that possession within a year from the date of theft shall be deemed sufficient evidence to authorize conviction. Note also in this connection that the first time this case was here, the Court found:
"There was ample evidence from which the jury could have found in this case * * * (2) that the defendant was in possession of such goods [goods stolen from interstate commerce], knowing them to have been stolen."

"A. Yes. There were men working there at the time.

"Q. You saw them take it off the platform?

"A. That is right.

"Q. Into the sorting room?

"A. That is right.

"Q. Did you ever see the defendant around the platform?

"A. No, I never did."

Edward Radigan, the other driver, testified:

"By Mr. Kossman:

"Q. Did you get a receipt for the merchandise you say you placed on the platform?

"A. No, sir.

"Q. How long did it remain on the platform?

"A. Well, as soon as I put it on the platform it was sorted out—sorted for its destination.

"Q. Did they take it off the platform and put it in the sorting room?

"A. They sort it down the roller into these various trailers.

"Q. Is that in back of the platform or the platform?

"A. Yes, sir.

"Q. Is that the sorting room—what they call the sorting room?

"A. Where I put it that is the sorting section. There is a sorter stands there and he marks it.

"Q. You saw the sorter take it and sort it?

"A. Yes, sir.

"Q. This particular package?

"A. Yes, sir.

"Q. Did you see where they put that package after they sorted it there?

"A. No, sir.

"Q. But where they sort it is off the platform, is that correct?

"A. Well, where they sort it it is right on the platform.

"Q. Don't they have a sorting room?

"A. No. They have monevators. They go along on rollers.

"Q. This was put on the roller?

"A. Yes, sir.

"Q. Where did it roll to?

"A. Well, it is all according to where it was going, and it is marked so by numbers.

"Q. This was going to West Virginia, is that correct?

"A. Yes, sir.

"Q. Where did it roll to?

"A. So far as I was concerned, it went down the platform.

"Q. Yes. But where does the roller end; where does it roll to?

"A. There is various trailers pulled into the platform that is marked for certain railroads such as the Lackawanna, the Pennsylvania, and it is sorted down a roller and shoved into these trailers and stacked and moved to various terminals, wherever it was destined to go. I don't know just what point this would go on.

"Q. But you saw it go on the rollers?

"A. That is correct.

"Q. You don't get a receipt when you deliver the merchandise, is that correct?

"A. No, sir. I just put the freight on the platform.

"Q. Are you familiar with the terminal at 11th Street?

"A. 11th Street?

"Q. 11th Avenue.

"A. Yes, I know 11th Avenue.

"Q. 11th Avenue.

"Q. Is this—referring to 'Defendant's Exhibit No. 3,' is that a picture of the 11th Avenue terminal?

"A. This is the picture of 11th Avenue.

"Q. Referring to 'Defendant's Exhibits Nos. 1 and 2,' is this a picture of 11th Avenue or Long Island?

"A. It looks like 11th Avenue to me.

"Q. How about 'Defendant's Exhibit No. 1?'

"A. This I can't figure. It is an express terminal, but I don't know whether it is 11th Avenue.

"Q. Well, is it the Long Island Terminal if you know?

"A. No, this is not Long Island.

"Q. Now, are there any rollers on this platform?

"A. No, sir. There are boxes running into a trailer—well, rollers.

"Q. Do they have a sorting room back of the platform?

"A. There is no sorting room. When they put the freight on the roller if the sorter is standing there he marks it and it goes along on a monevator. It circles the platform at 11th Avenue.

"Q. What is in back of the platform?

"A. A monevator. At 11th Avenue, there is a monevator runs in the center of the platform. You see, they dump on one side and they load on the other side.

\* \* \*

"Q. Now, is there a platform—referring to 'Defendant's Exhibit No. 3'— where the merchandise that you bring in the truck is dumped?

"A. Yes.

"Q. Is that correct?

"A. Yes. There is a platform on the other side of this.

"Q. There is another platform on the other side of this?

"A. No. It is the same platform. On the other side of this there is a platform. One is for dumping and one is for loading.

"Q. On one there is a sorting room?

"A. No. It goes on a monevator.

"Q. It goes on a monevator. I understand.

"The Court: It goes into the trailers marked for different railroads?

"The Witness: Yes, sir.

"By Mr. Kossman:

"Q. Did you see the merchandise you delivered that we are referring to today placed on the monevator, or roller, move towards the trailers?

"A. It moved in that direction. As soon as he put it on the roller it moved right along.

"Q. Did you ever see the defendant there?

"A. No, sir.

"Mr. Kossman: That is all.

"RE-DIRECT EXAMINATION.

"By Mr. Hourigan:

"Q. As I understand your testimony then, Mr. Radigan, 'Defendant's Exhibit No. 3' shows the loading side, not where you bring the goods in, is that correct?

"A. Yes, that is the loading side.

"The Court: He says 'Defendant's Exhibit No. 3' is only a part of the platform, it didn't show the part where he left this particular package, it was the other part; on the part where he left it there were rollers, it went on the rollers and started for the trailers, he saw it go down the rollers. That is where we now are."

## APPENDIX II

*Testimony*                    *Interview Report*

"Q. Miss Zippittelli, will you tell us where you live, please?

"A. 435 Palm Street.

"Q. In Scranton?

"A. Yes.

"Q. And how old are you, Miss Zippittelli?

"A. Eighteen.

"Q. Do you know the defendant, Eugene James Allegrucci?

"A. Yes, sir.

"Q. And would you identify him for the Court and jury?

"A. He is the one sitting in the middle of the table.

Mr. Hourigan: May the record show the witness has identified the defendant, Eugene James Allegrucci.

APPENDIX II

*Testimony*

*Interview Report*

"Q. How long have you known him approximately, Miss Zippittelli?

"A. Over eight years.

"Q. And do you know members of his family?

"A. Yes, sir.

"Q. And did you have occasion to go to the Allegrucci home when you lived near them?

"A. Yes, sir.

"Q. Will you relate the circumstances to the Court and jury under which you went there?

"A. Well, his mother was sick, she doesn't get around too well, and he come over and asked my mother if I could go over and stay with her while he went out of town or went out on business trips.

"Q. And what period of time did you do that at the Allegrucci household?

"A. Between 1954 and 1955.

"Q. Did you know the business that Mr. Allegrucci was in?

"A. Well, yes. He was selling paints and different articles like that.

"Rose Zippittelli, 638 Pear Street, age 15, advised on November 28, 1955, that she has stayed in Allegrucci's home with his mother on several occasions while Allegrucci was out of town, the last time being about two months ago. While at his home she would handle telephone messages and sign for parcels delivered by Parcel Post and Railway Express, Inc. She said Allegrucci kept his merchandise in his garage and would not allow any strangers inside the garage. She said she had been inside the garage, and most of his goods were in cartons, the contents not visible. She had noticed 'All' soap powder and lipstick in the garage. She stated that Allegrucci sells soap powders, costume jewelry, polishes, household appliances, and pen and pencil sets.

"Q. Did you ever have occasion to have a discussion with him about cameras?

"A. Well, yes, sir, we did. It was the night he was telling about taking pictures, he had his own dark room and he had a hobby, and he had his own camera and he used to take pictures and develop them himself.

"Q. Did you have a further conversation with him relative to calls that might be received at the house?

"A. Yes, sir. One night before he went out, it was in December——

"Q. What year?

"A. 1954. (Continuing)—he says: 'If anyone calls about cameras to take their name and address and about any other articles to take their name and address.'

"Miss Zippittelli said that an Italian-looking man called 'Spike' (LNU), used to visit Allegrucci frequently, and sometimes Allegrucci and 'Spike' would go out of town together. She said that either during the winter or spring of 1955, exact date unknown, Allegrucci asked her to stay with his mother. When she entered the living room of Allegrucci's home that day, 'Spike' was there with Allegrucci. There were two cameras lying on a table in the living room and 'Spike' asked her if she liked them. She said that she did and inquired if they were gifts. He just laughed and exchanged looks with Allegrucci. Shortly after this, Allegrucci and 'Spike'

## APPENDIX II

| Testimony | Interview Report |
|---|---|
| *Testimony* | *Interview Report* |

"Q. But he specifically stated in December 1954: 'If anybody calls about cameras take their name and address'? A. Yes, sir.

left to go some place, and as he left, Allegrucci told her if anyone should telephone about buying cameras, she should take their name and address. However, no one did telephone while she was there.

"Miss Zippittelli stated that she did not notice the brand name of instant cameras and was unable to accurately . describe them. She was exhibited one of instant Rolleicord cameras on November 29, 1955, and said that it was not the same type as she had seen in Allegrucci's home. She said that Allegrucci was interested in photography and told her that he had a dark room in his basement where he developed his own film.

[see above]

"Miss Zippittelli said that she had never known Allegrucci to sell a camera to Mrs. Dorothy Frances and did not know if Mrs. Frances ever owned a camera. She said that she did not know anybody who had obtained a camera from Allegrucci."

[There is evidently more of the statement in which Miss Zippittelli stated that she would cooperate and try to locate "Spike."]

## APPENDIX III

*Testimony*     *Interview Report*

"Q. Would you relate to the Court and the jury, please, your conversation with the defendant Allegrucci?

"A. I had an interview with Mr. Allegrucci on July 15, 1955.

He told me at that time that he was a salesman; that he sold such things as paint and brushes,

"On July 15, 1955, Eugene James Allegrucci, with aliases, Geni, Gene, 639 Pear Street, advised that he operates the Scranton Equipment Company, 639 Pear Street, and deals as a wholesaler in paints, brushes, and household appliances. He said he also sold Benrus Wristwatches, which he obtained from the Benrus Factory in New York. He keeps his merchandise in a small garage behind his house, and advised that all he had on hand at the moment was paint and brushes. He

[see below]

APPENDIX III

| *Testimony* | *Interview Report* |
|---|---|

costume jewelry; that he got some merchandise in Scranton from wholesale houses; that he obtained some of his merchandise in New York City from houses on Canal Street; also some of the merchandise he sold was distress merchandise;

he said that he had neither bought nor sold any cameras in over a year; that he had nothing whatsoever to do with cameras in over a year;

he said that he knew Alexander Gull; he denied that he had ever given any photographic equipment to Mr. Gull; in particular he denied having given any Rolleicord Cameras to Mr. Gull to sell.

"Q. Now, as I understand your testimony, Mr. Roberts, on July 15, 1955, he stated that he had neither bought nor sold any cameras for a year prior to that date, is that correct?

"A. That is correct.

"Q. Anything further in that conversation that you recall, Mr. Roberts?

"A. I asked him if he had any objections to showing me his merchandise that he had on hand. He said that he kept it in a garage behind his house. He said he did not wish to do so because he didn't want the neighbors to think he was in any difficulty.

"Q. Anything further, sir, that you think of?

"A. No, sir."

said he also deals in costume jewelry. Allegrucci said he goes to New York City and buys his jewelry from wholesale houses on Canal Street, and sometimes buys distressed merchandise in New York. He gets his paint, brushes, and appliances from regular wholesale supply firms in Scranton. He was reluctant to discuss his business.

"Allegrucci advised that he had never sold any cameras of any type, and that within the past year he had neither bought nor sold any cameras whatsoever. He said that he had not had anything whatsoever to do with any cameras within the past year or longer. He advised that he knew Alexander Gull, but denied that Gull had ever obtained any cameras from him, and denied any knowledge of Gull having sold any cameras.

"Allegrucci refused to voluntarily exhibit his merchandise on hand, saying that he did not want his neighbors to get the idea he was in any kind of trouble, and terminated the interview by saying he was going to see his attorney.

"Following the interview with Allegrucci, it was noted that he was visited at his home by two men in an automobile bearing 1955 Pennsylvania Registration 8827–V."