CAMPBELL ᴇᴛ ᴀʟ. *v.* UNITED STATES.

No. 631.  Argued April 25, 1963.—
Decided May 27, 1963.

488

*Melvin S. Louison* and *Lawrence F. O'Donnell* argued the cause for petitioners. With him on the brief was *Leonard Louison.*

*Solicitor General Cox* argued the cause for the United States. With him on the brief were *Assistant Attorney General Miller, Bruce J. Terris, Beatrice Rosenberg* and *Theodore George Gilinsky.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

This case, involving questions under the so-called Jencks Act, 18 U. S. C. § 3500,[1] is before the Court for the second time. When it was first here, we held inadequate

---

[1] The Act provides in part:

"(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

"(d) If the United States elects not to comply with an order of the court under paragraph (b) or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discre-

the procedure employed by the trial court for ascertaining whether notes taken by Federal Agent John F. Toomey, Jr., at his interview with Dominic Staula—a key government witness at petitioners' trial for bank robbery—or the Interview Report compiled by Toomey from his notes, were producible statements within the meaning of § 3500 (e)(1) or (e)(2). 365 U. S. 85.[2] We declined to order petitioners' convictions vacated, but remanded "to the trial court with direction to hold a new inquiry consistent with this opinion . . . [and] supplement the record with new findings . . . ." 365 U. S., at 98–99. On remand the trial judge held a hearing at which Toomey but not Staula testified. Toomey gave the following testimony: On the day following the robbery he interviewed Staula privately. Staula was a depositor of the bank and had been an eyewitness to the crime. Toomey took longhand notes of the interview, which were "complete . . . with respect to the pertinent information" given by Staula, although not a complete, word-for-word transcription of what he had said. Toomey then recited

tion shall determine that the interests of justice require that a mistrial be declared.

"(e) The term 'statement', as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—

"(1) a written statement made by said witness and signed or otherwise adopted or approved by him; or

"(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement."

[2] Specifically, we held that the district judge was required to hold a nonadversary hearing on the producibility of the notes and Interview Report. We also directed that attention be given the question what sanctions, if any, would be appropriate if it developed that the notes were producible but had been destroyed and that no copy had survived. See 365 U. S., at 93, 18 U. S. C. § 3500 (d).

back to Staula the substance of his account, referring to his notes, and Staula said that Toomey had got it straight. Staula did not read or sign the notes. About seven hours later Toomey, after rearranging his notes to accord with the chronology of Staula's account, dictated the Interview Report, relying primarily on his notes but also on memory. After checking the transcribed report against the notes and finding it accurate, he destroyed the notes.[3]

On the basis of this testimony and the record of Staula's testimony at petitioners' trial, the trial judge held that neither the notes nor the Interview Report was producible under the Jencks Act. 206 F. Supp. 213. On appeal, the Court of Appeals expressed dissatisfaction with the judge's conduct of the hearing but accepted his ruling that the Interview Report was not producible. 296 F. 2d 527. However, the court held that the status of the notes could not be adequately determined without fresh testimony from Staula.[4] Accordingly the court, while retaining jurisdiction of the appeal generally, ordered a further hearing before a district judge other than the trial judge, with both Staula and Toomey to testify, for a determination "whether Staula signed or otherwise adopted or approved the notes." Id., at 534.

At this hearing Staula testified that he had not read or signed Toomey's notes but had told Toomey that what the latter had repeated back to him was, to the best of

---

[3] The Interview Report was released by the Court of Appeals and was included in the record before this Court in Campbell I. The full text of the report is reproduced in 365 U. S., at 90 and 91, n. 3.

[4] Although Toomey testified at the hearing that Staula had not signed or read the notes, Staula had testified at petitioners'. trial: "I think they wrote down what I said, and then I think they gave it back to me to read over, to make sure that it was right. And I think I had to sign it. Now, I am not sure. I couldn't remember before." 365 U. S., at 89, n. 2. Staula was referring to his interview with Toomey.

his knowledge, what had happened. Toomey amplified his earlier testimony. On this record the second district judge concluded, 199 F. Supp. 905, that Toomey's oral presentation to Staula had "not merely adhered to the substance [of the notes] but so far as practical to the precise words," *id.*, at 906; that Staula had adopted this presentation; that the Interview Report was "almost *in ipsissima verba* the narrative . . . [Toomey] had just checked with Staula," *id.*, at 907; and that therefore the report was producible as "a written statement made by said witness and . . . adopted . . . by him." 18 U. S. C. § 3500 (e)(1).

The Court of Appeals then filed a supplemental opinion in which it accepted the second district judge's findings but held that the report was neither a written statement approved by Staula nor a copy of such a statement, and hence did not come within § 3500 (e)(1). 303 F. 2d 747. We granted certiorari and leave to proceed *in forma pauperis.* 371 U. S. 919. We reverse. We agree with the second district judge that the Interview Report was producible under § 3500 (e)(1); consequently, we do not reach the other issues tendered by petitioners.[5]

---

[5] These issues, basically, are whether the Interview Report is producible under § 3500 (e)(2) of the Jencks Act and whether, if the notes are producible under the Act, their destruction gives rise to sanctions under subsection (d), or permits secondary evidence of their contents to be produced. The second district judge found that the Interview Report was a substantially verbatim recording of Staula's oral statement to Toomey and hence producible under § 3500 (e)(2). The Court of Appeals disagreed. Moreover, in denying rehearing, the Court of Appeals rendered an opinion holding that no sanctions could attach to Toomey's destruction of his notes because such destruction had not been in bad faith. 303 F. 2d, at 751. Our holding that the Interview Report is producible under § 3500 (e)(1) makes it unnecessary for us to consider any of the other issues, and we intimate no view on the correctness of the Court of Appeals' rulings on them.

In *Campbell* I, we posed the following questions to frame the hearing on remand:

> "Did Toomey write down what Staula told him at the interview? If so, did Toomey give Staula the paper 'to read over, to make sure that it was right,' [as Staula had testified at the trial]· and did Staula sign it?
>
> "Was the Interview Report the paper Staula described, or a copy of that paper? In either case, as the trial judge ruled, the Interview Report would be a producible 'statement' under subsection (e)(1)." 365 U. S., at 93.

We now know that the "paper Staula described" was Toomey's interview notes, and that Staula adopted Toomey's oral presentation based on the notes. Plainly, if Toomey in making the oral presentation was in fact reading the notes back to Staula, the latter's adoption of the oral presentation would constitute adoption of a written statement made by him, namely, the notes. See *United States* v. *Annunziato*, 293 F. 2d 373, 382 (C. A. 2d Cir. 1961); *United States* v. *Aviles*, 197 F. Supp. 536, 556 (D. C. S. D. N. Y. 1961).[6] The producibility of the Interview Report under § 3500 (e)(1) would therefore seem to depend upon. the answers to two questions: whether Toomey's oral version of the notes may fairly

---

[6] It is settled, of course, that a written statement, to be producible under § 3500 (e)(1), need not be signed by the witness, *Campbell* I, at 93–94; *Bergman* v. *United States*, 253 F. 2d 933, 935, n. 1 (C. A. 6th Cir. 1958); cf. *United States* v. *Allegrucci*, 299 F. 2d 811, 813 and n. 3 (C. A. 3d Cir. 1962), or written by him, *Campbell* I, at 93; *United States* v. *Thomas*, 282 F. 2d 191, 194 (C. A. 2d Cir. 1960); H. R. Rep. No. 700, 85th Cong., 1st Sess. 5–6 (1957); Note, The Supreme Court, 1960 Term, 75 Harv. L. Rev. 40, 181–182 (1961), or be a substantially verbatim recording of a prior oral statement, see *United States* v. *McCarthy*, 301 F. 2d 796 (C. A. 3d Cir. 1962); *United States* v. *Berry*, 277 F. 2d 826 (C. A. 7th Cir. 1960).

be deemed a reading back of the notes to Staula; and whether the Interview Report may fairly be deemed a copy of the notes.

We think these questions properly are ones of fact, the determination of which by the district judge may not be disturbed unless clearly erroneous. "Final decision as to production must rest, as it does so very often in procedural and evidentiary matters, within the good sense and experience of the district judge guided by the standards we have outlined, and subject to the appropriately limited review of appellate courts." *Palermo* v. *United States*, 360 U. S. 343, 353. Cf. *id.*, at 360 (concurring opinion); *Hance* v. *United States*, 299 F. 2d 389, 397 (C. A. 8th Cir. 1962); *United States* v. *Thomas*, 282 F. 2d 191 (C. A. 2d Cir. 1960). "The inquiry . . . [is] a proceeding necessary to aid the judge to discharge the responsibility laid upon him to enforce the statute. . . . The statute . . . implies the duty in the trial judge affirmatively to administer the statute in such way as can best secure relevant and available evidence . . . ." 365 U. S., at 95. To determine the accuracy with which Toomey's oral presentation and Interview Report reproduced his notes was preeminently a task for a *nisi prius*, not an appellate, court. It required the *ad hoc* appraisal of one of the "myriad" "possible permutations of fact and circumstance," *Palermo* v. *United States, supra,* at 353, present in such cases; it may well have depended upon nuances of testimony and demeanor of witnesses; and it concerned a subject, rulings on evidence, which is peculiarly the province of trial courts.[7]

For the purpose of applying the clearly-erroneous standard in the instant case, we deem controlling the find-

[7] The producibility of statements under the Jencks Act and their admissibility under the rules of evidence are separate questions, *United States* v. *Berry,* 277 F. 2d 826, 830 (C. A. 7th Cir. 1960), but obviously closely related.

ings of the second district judge. As the Court of Appeals correctly held, the first hearing did not conform to our mandate in *Campbell* I because Staula was not called to testify; and the hearing was unsatisfactory in other respects.[8] Moreover, while Toomey's testimony at the second hearing did not contradict his earlier testimony, it was considerably more detailed. Also, we perceive no basic inconsistency between the fact-findings made at the first hearing and those made at the second, although the later findings were more elaborate.[9] Finally, we read the supplemental opinion of the Court of Appeals as having accepted the later findings as controlling and based its decision upon them.

In so doing, the Court of Appeals implicitly concluded that the later findings were not clearly erroneous. That

---

[8] "While technically the court called Toomey itself and permitted the defendants to cross-examine, the restrictions imposed upon counsel were such that it was cross-examination in name only. In spite of the fact that the witness was a special agent of long standing who had discussed his testimony with the Assistant U. S. Attorney immediately before the hearing, the court hovered constantly over him like an over-anxious mother. With respect to correlation between the notes, Staula's statements, and the eventual report, the Supreme Court's directions for a non-adversary proceeding to assist the court in performing its duty, with the defendants permitted to cross-examine, were honored largely in the breach." 296 F. 2d, at 529.

[9] The first district judge's findings, so far as pertinent to the issue of producibility under § 3500 (e) (1), read as follows:

"3. . . . Agent Toomey repeated to Mr. Staula, from memory and using the notes which he had taken only to refresh his recollection, the substance of the story which Mr. Staula had related to him. . . .

"4. Agent Toomey did not transcribe the story related to him by Mr. Staula word for word." 206 F. Supp., at 214. We do not read these as findings that Toomey's oral presentation was not an accurate reproduction of the contents of the notes. Apparently, the judge based his conclusion of nonproducibility under § 3500 (e) (1) on the legally erroneous supposition that adoption of an oral presentation of

conclusion was surely sound. Although there may well be small differences as among the notes, oral presentation, and Interview Report, it is not seriously suggested that there was a material variance or inconsistency among them.[10] And the district judge was entitled to infer that an agent of the Federal Bureau of Investigation of some 15 years' experience would record a potential witness' statement with sufficient accuracy as to obviate any need for the courts to consider whether it would be "grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness' own." *Palermo* v. *United States, supra,* at 350. We cannot say, therefore, that the second district judge's finding that the Interview Report was a copy of a written statement made and adopted by Staula was clearly erroneous.[11]

Our holding today only gives effect to the "command of the statute [which] is . . . designed to further the fair and just administration of criminal justice . . . ."

---

a written statement did not constitute a permissible mode of adopting the written statement.

[10] One judge, concurring in the Court of Appeals, questioned the correctness of the Distict Court's finding that the Interview Report recorded Staula's statement "almost *in ipsissima verba*." 303 F. 2d, at 751. But he did not suggest, nor, we think, could he on this record, that there were material differences between the statement and the report. It is not suggested, for example, that the descriptions of the robbers in the report or the statement in the report that Staula had not observed a third robber—the crucial portions of the report for impeachment purposes—differed in the slightest relevant particular from the notes or oral presentation. The only variances, apparently, are grammatical and syntactical changes, rearrangement into chronological order, and omissions and additions of information immaterial for impeachment purposes.

[11] As a copy, we consider the report admissible as independent evidence for impeachment purposes, and not merely as secondary evidence of the notes which have been destroyed. See generally *United States* v. *Annunziato, supra,* at 382; *United States* v. *Thomas, supra,* at 194–195.

*Campbell* I, 365 U. S.; at 92.[12]   Petitioners—Alvin R. Campbell and Arnold S. Campbell, brothers, and Donald Lester—were convicted of a serious crime and sentenced to long prison terms. At their trial, held four months after the bank robbery, Staula testified that there had been three robbers. One, who had worn "a white shirt with short sleeves," Record, *Campbell* I, No. 53, October Term 1960, p. 141, he said resembled Lester. Another, who "had on a blue suit," *id.*, p. 142, he said resembled Arnold Campbell. The third he had glimpsed "[a]t the vault," *id.*, p. 170; but could not describe. The Interview Report, however, states that Staula "did not observe a third man in the bank." Of the two he did observe, one is described as wearing a "[d]ark blue suit" and "[w]hite shirt"; but at the trial, when asked whether he remembered "what kind of a shirt, if any, the man in the blue suit was wearing," Record, *supra*, p. 148, Staula answered: "No, because I saw him from the side. I didn't see the front of him. I didn't see his shirt." *Ibid.* And in the description in the report of the second man Staula observed, there is no mention of his wearing "a white shirt with short sleeves"; he is only described as "wearing gray chino pants," and the report adds that Staula "only observed the man . . . for an instant and could give no further description of him." Surely fairness in federal criminal procedure, which the Jencks Act

[12] "Every experienced trial judge and trial lawyer knows the value for impeaching purposes of statements of the witness recording the events before time dulls treacherous memory. Flat contradiction between the witness' testimony and the version of the events given in his reports is not the only test of inconsistency. The omission from the reports of facts related at the trial, or a contrast in emphasis upon the same facts, even a different order of treatment, are also relevant to the cross-examining process of testing the credibility of a witness' trial testimony." *Jencks* v. *United States*, 353 U. S. 657, 667. The Jencks Act, of course, "reaffirms" our holding in *Jencks* v. *United States, supra. Campbell* I, at 92.

was enacted to secure, *Campbell* I, 365 U. S., at 92, demands that this Interview Report, reasonably found to be an accurate copy of a written statement made the day after the robbery by Staula and adopted by him as his own, be producible for impeachment purposes.[13]

The judgment of the Court of Appeals and the judgments of conviction are vacated,[14] and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Mr. Justice Clark, with whom Mr. Justice Harlan and Mr. Justice Stewart join, dissenting.

In this case an FBI Agent, John F. Toomey, Jr., conducted a 30-minute interview of Dominic Staula, a witness to the bank robbery involved. The Special Agent asked Staula some questions and while they were being answered jotted down notes. Upon completion of the interview the Special Agent orally recited to Staula the substance of the interview, refreshing his memory from his notes as he did so. He then asked Staula if the recitation was correct and received an affirmative reply. This was at noon. About nine o'clock that night the Special Agent transcribed the report on a dictating machine for subsequent typing, using the notes, as well as his memory, for the dictation. After the report was

---

[13] We intimate no view on the probative weight to be accorded the Interview Report as impeaching Staula's trial testimony; that is a matter for the triers of facts. And of course nothing we say is intended to suggest that a showing of inconsistency is a prerequisite to the production of documents under the Jencks Act. *Jencks v. United States, supra,* at 667–668; 18 U. S. C. § 3500 (b).

[14] Understandably, no contention has been made that the refusal to produce the Interview Report can be deemed harmless error under the principles laid down in *Rosenberg v. United States,* 360 U. S. 367. Cf. *Gordon v. United States,* 344 U. S. 414.

typed by a secretary, working entirely from the transcription, he checked its accuracy and then destroyed the notes.

The Court holds the "oral recitation" to be "a written statement made by said witness [Staula] and . . . adopted . . . by him," within the purview of 18 U. S. C. § 3500 (e)(1). It reaches this result via a construction reminiscent of the Rube Goldberg cartoons, basing its holding upon the following conclusions: (1) the Special Agent may be fairly deemed to have read his notes back to Staula, since "it is not seriously suggested that there was a material variance or inconsistency"; (2) Staula approved and thereby adopted this "reading" of the notes; and (3) the Special Agent reduced the notes to narrative in his interview report which, as the trial court found, was "almost *in ipsissima verba* the narrative" the Special Agent had recited to Staula. The Court thus transmutes the interview report into a written statement made by Staula and adopted by him and strikes down the conviction because the interview report was not produced at the trial upon the request of the defense.

This conclusion, however, will not bear analysis. Even though Staula's approval of the oral recitation as correct be deemed *arguendo* an adoption by him, the oral recitation, nevertheless, was not a written statement within the meaning of the Jencks Act, 18 U. S. C. § 3500. The interview report of the Special Agent was written by the agent, not Staula, and was never approved by Staula in its written form. The statute applies to "a written statement made by said witness." At the very least the "written statement" referred to by the Act is one which is, if not written by the witness, adopted by him in its final written form. The notes to which the agent referred in preparing his report do not rise to the dignity of a statement. They were, as the trial court found, "jottings" of the Special Agent in aid of his memory for purposes of

later dictating his formal report. These notes were not in narrative form, they were not read to Staula by the Special Agent, nor did Staula read them himself or initial or sign them. The Special Agent merely recounted to Staula a narrative of the events which the latter had described. It is true that in so doing he referred to his notes from time to time, but the evidence is clear that the notes were not included verbatim in this recitation. Every lawyer—indeed every layman experienced in the taking of interviews—knows full well that it is extremely unlikely that any two narratives, even though prepared from identical notes, will be alike. Likewise the common experience of all of us belies the conclusion that the interview report was "almost *in ipsissima verba* the narrative" recited by the Special Agent to Staula. But even if it were, the statute does not cover a written report such as we have here, prepared from the agent's memory, as well as his notes, some nine hours subsequent to the interview and neither read by or to the witness nor shown to him prior to what the Court terms his "adoption" of it.

The Court reads the trial court's findings as holding that the Special Agent, in presenting the information for Staula's comments after the interview, adhered to the precise words of the notes, so far as practical. But the testimony is to the contrary and is unequivocal.* It then

---

*"Q. Did you, Mr. Toomey, write down what Mr. Staula told you at the interview?

"A. I took notes concerning the information that he furnished to me." Cross-examination of Special Agent Toomey, Transcript of Record, p. 4.

    .       .       .       .

"Q. Mr. Toomey, did you give Mr. Staula the paper that you made your notes on to read over?

"[fol. 12] A. I did not, sir.

"Q. Did you read it back to Mr. Staula?

holds that this finding is not clearly erroneous. But the simple answer to this is that the finding has no support in the record. In addition, there are three vital flaws in the adoption of this inference—and that is all that it is—that the oral narrative to Staula was identical to that related nine hours later in the interview report. The trial judge stated what was said to be Toomey's testimony that *"anyone* who heard Staula and had Toomey's jottings would have dictated *the same words."* (Emphasis supplied.) 199 F. Supp. 905, 907. But this overlooks (1) the limitation Toomey put on the word *"anyone," i. e.,* anyone who had "the same knowledge of the case"; (2) that Toomey did not say that the interview report was in "the same words" as the narrative to Staula but twice

---

"A. As I previously stated, I took notes and I did not read the notes back to him verbatim." *Ibid.*

.        .        .

"THE COURT: The witness said he went over his notes.

"Did you mean to infer that you read your notes over [fol. 54] to Mr. Staula?

"THE WITNESS: No, sir, I did not.

"THE COURT: You looked at them and then you repeated what he said—you didn't read them over to him?

"THE WITNESS: No.

"THE COURT: He didn't see them?

"THE WITNESS: No, your Honor.

"THE COURT: They were in your possession so he could not have done that.

"Q. There was the desk in the front of where both of you people were sitting?

"A. Yes.

"Q. Your notes contained the whole story supplied to you by Mr. Staula?

"A. That is correct.

"Q. And it was vital, wasn't it, Mr. Toomey, that what was contained in your notes be Mr. Staula's story?

"A. That is correct.

"Q. The method you employed to double check was to read your notes, of what Mr. Staula had told you aloud and get Mr. Staula to

repeated in his testimony that the language of the interview report was *"substantially the same thing"* he had related to Staula; and (3) the notes made by Toomey had not been "just checked with Staula," *ibid.*, for it had been nine hours since Toomey had even seen him. Hence the findings of the Court of Appeals were entirely correct and those of the trial judge clearly erroneous. This is made as clear as crystal in the concurring opinion of Judge Aldrich. As he said, it would be a "surprising coincidence" that "the checking back with a witness at noontime of a consolidation of jottings and memory, and the dictation of a report in the evening, would result in the

---

agree with you that that was accurate—the information that you had for future use, that is so isn't it, Mr. Toomey?

"[fol. 55] A. Not exactly. I did not read them back to the witness. I went over the story again, refreshing my memory by referring to my notes.

"Q. That is right—that is what your memory was, which was on the papers that you had recorded—and whatever you said came from those papers, that is so, isn't it?

"A. No, sir, not everything." *Id.*, at 19–20.

"Q. Now, of course, Mr. Toomey, with all your experience, investigating this bank robbery, it is so, isn't it, that the most vital part of the entire interview was the question whether or not your notes meant to Mr. Staula the same thing as they meant to you; that is so, isn't it?

"MR. KOEN: I pray your Honor's judgment.

"THE COURT: Well, he may answer that question.

"A. No.

"Q. Now isn't it so, Mr. Toomey, that another vital part of your interview was whether or not the wellspring of all your knowledge regarding Dominic Staula was correct?

"A. Yes.

"Q. As a matter of fact, after you had read back, it is so, isn't it, sir, that the most vital part of your entire effort taking notes, reading them back, was the question [fol. 327] whether or not Dominic Staula agreed with them?

"A. I didn't read the notes back to him, sir." Redirect examination of Special Agent Toomey, *id.*, at 123.

identity inferred by the court." 303 F. 2d 747, 751. Even the expertise of an experienced Special Agent of the FBI does not rescue such a conclusion from beyond credulity.

As we said in *Palermo* v. *United States,* 360 U. S. 343, 350 (1959), the Congress felt that it would "be grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness' own rather than the product of the investigator's selections, interpretations and interpolations." This is exactly what the Court is doing today. Extension of the statute to include such reports can only result in mischief, permitting a skillful defense lawyer to repudiate and destroy a witness and obstruct the administration of justice. I therefore dissent.