**UNITED STATES of America**

v.

**Vernon Earl WALDEN.**

**Crim. No. 77–127–1.**

United States District Court,
E. D. Pennsylvania.

Nov. 6, 1978.

Thomas Colas Carroll, Carroll, Creamer, Carroll & Duffy, Philadelphia, Pa., for appellant.

Robert N. deLuca, Walter S. Batty, Jr., Edward S. G. Dennis, Asst. U. S. Attys., Philadelphia, Pa., for appellee.

## MEMORANDUM

HANNUM, District Judge.

Defendant was convicted by a jury on June 24, 1977, of having conspired with four codefendants to distribute heroin and to possess heroin with intent to distribute. On July 22, 1977, defendant was sentenced to fifteen (15) years imprisonment and a lifetime special parole term. An appeal followed and the case is presently before this Court on remand from the Third Circuit Court of Appeals. *United States v. Walden*, 578 F.2d 966 (3d Cir. 1978). The format for this Memorandum is sourced from the opinion of Wyzanski, J., in *United States v. Campbell*, 199 F.Supp. 905 (D.Mass.1961).

The case was remanded for two purposes. First, this Court is to supplement the record with a statement of reasons for denying a further continuance as requested by defendant in his motions of June 13 and 14, 1977. Second, this Court is to examine the handwritten notes and draft reports of Drug Enforcement Administration (D.E.A.) Agent Wallace B. Mitchell and make findings on whether these constitute "statements" within the meaning of the Jencks Act, 18 U.S.C. § 3500 (1970), and if so, whether the failure to order their disclosure to defense counsel at trial was harmless error.

## I. PROCEEDINGS ON REMAND

Anticipating the directions contained in the formal Court of Appeals Mandate which was filed July 10, 1978, the Court directed the Assistant United States Attorney to produce the handwritten notes and draft reports in question. By letter of July 6, 1978, however, the Court was informed that neither the Assistant United States Attorney nor the agents of D.E.A. were able to locate the handwritten materials. In light of this development, the Court, after a conference with counsel, scheduled a hearing for July 28, 1978, at 10:00 A.M. On July 26, 1978, the Court received a letter from Harry R. Seay, Esquire, requesting that the hearing be continued until the week of August 14 due to a recent family tragedy. N.T.–1 at 31, 32.[1] The rescheduled hearing was conducted on August 16, 1978 and the notes of testimony are transmitted herewith.

Based on the testimony of defendant adduced at the August 16, 1978 hearing, the government requested a second hearing by letter of August 22, 1978 to which the Court assented by scheduling a second hearing on September 18, 1978. Notes of testimony from the second hearing are also transmitted with this Memorandum.

## II. DENIAL OF THE CONTINUANCE

### A. Facts

1. Since Harry R. Seay, Esquire, represented three defendants in the case, N.T. at 11, the Court conducted a conflict of interest hearing on June 6, 1977.[2] At the hearing, it became apparent that Walden in fact *was* concerned about Mr. Seay's representing him along with other defendants and he so stated in open court:

"A. I do not wish to be represented by any attorney that is defending any defendant that is involved in this case, Your Honor.

Q. So you are stating, then, that you do not want Mr. Seay now?

A. Since Mr. Seay is representing Mr. Ford and Mr. Hines—no, sir. I have no desire for his services at this time." N.T. at 19.

2. Immediately following the conflict of interest hearing on June 6, a conference was held in chambers during which Harold Randolph, Esquire, was contacted concerning his availability to represent Walden. N.T.–2 at 7, 8, 30, 31. At the conference, it was decided that Mr. Randolph was to assume the defense of Walden and that trial was to commence within one week. N.T.–2 at 30, 31. After the conference, the matter was explained to Walden by Mr. Seay and defendant expressed no objection to his being represented by Mr. Randolph.[3] N.T.–2 at 10, 35, 36.

3. On June 7, 1977, Mr. Randolph informed the Court by telephone that a conflict in his schedule could interfere with his representation of Walden. N.T.–2 at 45, 46. The conflict concerned a multi-defendant criminal case that was to be tried before Honorable John Gerry of the United States District Court for the District of New Jersey on June 13, 1977. N.T.–2 at 46.[4]

4. Efforts to obtain counsel to replace Mr. Randolph in the New Jersey case were successful, however, and by the afternoon of June 9, 1977, it was clear to all concerned

1. For the sake of clarity, references to the transcript of the original trial will be cited as N.T.; references to the first hearing on remand will be cited as N.T.–1; and those to the second hearing on remand as N.T.–2.

2. The hearing was held in accordance with *United States Ex Rel. Hart v. Davenport*, 478 F.2d 203 (3d Cir. 1973) despite Mr. Seay's prior assurances that no conflict of interest existed. *See* N.T. at 11.

3. We recognize that there is considerable testimony to the contrary from defendant at the first hearing on remand. *See* N.T.–1 at 40–49. However, all issues of credibility have been resolved against defendant in light of the later testimony of Mr. Seay and Mr. Randolph. Additionally, it is undisputed that any dissatisfaction defendant had with Mr. Randolph's representation was never brought to the Court's attention.

4. *United States v. George Holland*, Criminal No. 77–149, (D.N.J.), replacement counsel was Timothy P. Booker, Esquire. N.T.–2 at 46, 47.

that Mr. Randolph was to proceed in the Walden matter on June 13; 1977. N.T.–2 at 41–42, 46–47.

## B. Analysis

The foregoing reflects the factual background that existed when the Court denied the June 14 motion for a further continuance.[5] When viewed against this background, the Court believes that the denial of a further continuance was fair and within its discretion.

■ We were faced with a large trial which required coordination of the presence of several defendants, numerous counsel and many witnesses. When this factor, combined with the week's delay which had already resulted from the substitution of counsel, was balanced against the time Mr. Randolph had available for preparation, it was, and is, the Court's view that further delay was unwarranted. Mr. Randolph had well over a week to review the case (June 6–June 14) or at a minimum six days (June 9–June 14). The Court was also aware that most of the groundwork had already been done by Mr. Seay. It is clear from Mr. Randolph's testimony that he had adequate time to review the file and prepare by June 13 and that he did so.

"A. I didn't only discuss the matter with Mr. Seay. I discussed the matter with Mr. Johnson and Mr. Mozenter. *I went over everything but talking to Mr. Walden, whose position I clearly understood.*" N.T.–2 at 58, (emphasis added).

Further, it does not appear that an assertion of the attorney-client privilege by Mr. Seay interdicted Mr. Randolph's preparation. Mr. Randolph was allowed access to Mr. Seay's file insofar as it related to Walden, N.T.–2 at 66, and in any event, Mr. Randolph considered the other evidence in the file as unrelated to his client. N.T.–2 at

37. Additionally, Mr. Randolph had access to the complete government file and this too was used to prepare. N.T.–2 at 49. Finally, concerning independent investigation of alleged harassment of Walden by D.E.A. Agents,[6] Mr. Randolph admits:

"Now, as you well know, much of this is by virtue of informants and acts of agents which I could not have obtained even by the broadest rules of discovery, but Mr. Walden having told me these matters I thought it was my duty to check something out, some portions of them out, because Mitchell, the main agent in here, had nothing to do with Walden as I could find out, even from the tapes." N.T.–2 at 57.

As to the availability of defense witnesses, initially it is noted that Mr. Randolph had between six and nine days to locate them. Additionally, the Court was aware that this was to be a lengthy trial and we anticipated that it would be at least another week before the defense was to produce evidence, and counsel informed the Court that the witnesses could be located within a week. N.T. at 28.[7] It was thus, in the Court's view, apparent that sufficient time was allowed.

Although the issue of defendant's purported dissatisfaction with counsel was not before this Court prior to the remand, we believe it deserves comment. While defendant did not actively participate in obtaining substitute counsel, there was no basis, on the record or otherwise, to believe that a conflict existed between defendant Walden and Mr. Randolph. In fact, the only representation made to the Court was to the contrary. N.T. at 25. Mr. Randolph is a seasoned and capable trial lawyer whose previous association as counsel to Walden had been satisfactory. N.T.–2 at 29, 30. Defendant's request for an *in cam-*

5. The June 13 motion for a continuance was granted, albeit only for one day. It was the court's view, however, in light of the other circumstances, that the only preparation remaining was Mr. Randolph's interview of Walden, and that this should require no more than a day. *See,* N.T.· 2 at 58.

6. This aspect never became a material issue in the case.

7. As the trial ultimately developed, the defense case did not commence until the ninth day— well over two weeks after Mr. Randolph became involved.

*era* conference came in the midst of a discussion of matters wholly unrelated to Mr. Randolph's substitution for Mr. Seay. The Court's view was that Mr. Randolph adequately presented defendant's position on the other matters and that an *in camera* conference with Walden was not appropriate. *See* N.T.–2 at 55.

Since the decision to grant a continuance in such circumstances rests in the sound discretion of the trial court, and it has been held not to be an abuse of discretion to deny a continuance even when the Court is aware of the conflict between counsel and client, *United States v. Uptain*, 531 F.2d 1281 (5th Cir. 1976), the Court believes where, as here, the conflict was never brought to the Court's attention, there was no abuse in denying the motion. Further, this Court is not convinced that any disagreement existed between Walden and Mr. Randolph. It is emphasized that given the conflict between the testimony of defendant and that of Messrs. Seay and Randolph, all issues of credibility relating to the existence of a conflict between defendant and substitute counsel must be resolved against defendant.

Finally, as to the government's lack of objection to the motion for a continuance, the Court makes the following observations. The Assistant United States Attorney's statement of June 13, 1977 that: "The government does not object to that particular request . . . ." was based primarily on the lack of opportunity Mr. Randolph had had to speak with his client. N.T. at 26. The government took *no* position on the renewed motion for a continuance made on June 14. Since the government took a neutral position on June 14 and the reason for acquiescence expressed on June 13 had been eliminated in the Court's view, by the one day continuance, the government's previous statement militated neither for nor against the motion. Having considered the

other issues concerning preparation time and having resolved them against defendant, the Court denied the motion.

In summary, it was the Court's view that the replacement of Harry Seay, Esquire, with Harold Randolph, Esquire, in order to avoid the conflict of interest was entirely proper; and, that Mr. Randolph, having been given better than a week to familiarize himself with the case was afforded ample opportunity to prepare. In this regard, Mr. Randolph makes a most telling point when, near the conclusion of the second hearing on remand, in response to a direct question concerning whether or not he was prepared on June 13, he states:

"On June the 13th, sir, in terms of preparation based upon discussion with other counsel, my knowledge of the evidence, I was not prepared in this sense: I was not prepared to go to trial with the co-defendants.

Now, you know what that means. I mean, you know what that means, I'm sure, because the evidence against the co-defendants was such that I did not want to expose Mr. Walden to that type of situation." N.T.–2 at 65, 66.

Thus, it appears that the overriding concern was with the extensive evidence to be introduced against the co-defendants. We recognize that this is a dilemma inherent in any conspiracy prosecution; but it is also well established that it is a dilemma to be resolved by the motion for severance, not by delaying the entire case.[8]

### III. THE JENCKS ACT MATERIAL

#### A. Facts

1. In connection with his investigation of this case, D.E.A. Agent Wallace B. Mitchell made routine reports which were typewritten and incorporated into the investigative file. N.T.–1 at 5 *et seq.*

---

8. As I reflect on the circumstances here, respecting the continuance, there is just no question that everybody knew the case here was to be tried. Judge Gerry had, characteristically, been enormously helpful and when Mr. Randolph made a motion to continue after, from where we stood, all t's were crossed and i's dotted, his basis for the continuance, because of the corrosive effect of the evidence against his fellow defendants, had little weight with me.

2. The typewritten report (report) was prepared from a handwritten draft (draft) which was written by Agent Mitchell in longhand. N.T.–1 at 5.

3. No handwritten materials other than the drafts are involved in this case. N.T.–2 at 6.[9]

4. After writing a draft, Agent Mitchell would forward it to his supervisor for review. The supervisor would then send the draft for typing. N.T.–1 at 6.

5. The supervisor made no changes in a draft except to correct code identifiers, distribution markings and to rectify spelling or grammatical errors. N.T.–1 at 14.

6. After typing, Agent Mitchell reviewed the drafts and reports to insure the accuracy of the reports. N.T.–1 at 6.

7. The drafts and reports contained the same information and, except that the drafts were written and the reports typed, were identical. N.T.–1 at 11.

8. Agent Mitchell had the drafts in his possession at the time of trial. N.T.–1 at 7. But, since that time he has been unable to locate them. N.T.–1 at 3.

9. Agent Mitchell had a practice of destroying old drafts that had been typed into final reports. N.T.–1 at 8, 9.

10. This case was tried prior to the implementation by D.E.A. of a policy requiring retention of drafts. N.T.–1 at 9, 17.

### B. Analysis

At trial, the relevant reports were provided to defense counsel for use in cross-examination of Agent Mitchell as required by 18 U.S.C. § 3500 (1970). (Hereinafter Jencks Act). It became apparent during the cross-examination of Agent Mitchell, however, that in addition to the final reports, there also existed the drafts from which the reports were typed. Accordingly, defense counsel made a motion for production of the drafts which was denied on the basis of *United States v. Carrasco*, 537 F.2d 372, 377

(9th Cir. 1976). Upon remand of the matter, this Court was directed to examine the drafts to determine whether they are revealable statements under the Jencks Act. As noted earlier, however, we have been unable to comply with this direction due to the government's inability to produce the drafts.

It is not entirely clear why the drafts are unavailable now, it being undisputed that at least some of them were in Agent Mitchell's possession at the time of trial. There is ample evidence in the record that the drafts may have been processed through a shredding machine, and for purposes of this inquiry, the Court must conclude they have been destroyed.

The initial focus of the Court of Appeals' Mandate is a determination of whether the drafts were "statements" of Agent Mitchell thus falling within the literal terms of the Jencks Act. 18 U.S.C. § 3500(e) states in relevant part:

(e) The term "statement", as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—

(1) a written statement made by said witness and signed or otherwise adopted or approved by him; . . . .

■ Since it is beyond doubt that the drafts are written documents, the sole question becomes whether the documents were approved or adopted by Agent Mitchell. In order to approve or adopt a statement, it is not necessary that the witness sign the writing. *United States v. Tomaiolo*, 280 F.2d 411 (2d Cir. 1960). The standard does require a form of approval comparable to signature. *Campbell v. United States*, 296 F.2d 527, *on remand* 199 F.Supp. 905, *affirmed*, 303 F.2d 747 (1st Cir. 1962), *vacated on other grounds and remanded* 373 U.S. 487, 83 S.Ct. 1356, 10 L.Ed.2d 501 (1963). In short, the witness must, in some manner, affirmatively express his assent to the content of the writing.

---

**9.** Initially there was some confusion on this point. The agents involved and both counsel preliminarily referred to notes as well as drafts. At the first hearing on remand, however, it was the uncontradicted testimony of Agent Mitchell that no notes were taken during, or immediately after his encounters with the defendants in this case. *See* N.T.–1 at 21–23.

In the instant case, Agent Mitchell expressed his assent to the content of the drafts when he sent them to his supervisor for review knowing full well that after review by his supervisor, Agent Thomas G. Moore, the drafts would be forwarded to the group secretary for typing. Agent Mitchell signed the typed reports but not the drafts. Since he testified they were identical, it would be an exercise in illogic to hold that he had adopted the former but not the latter. Accordingly, the Court finds that the drafts were approved and ·adopted by Agent Mitchell and were "statements" within the meaning of the Jencks Act.

By this same reasoning, that is, because the drafts and reports were identical, the Court finds that refusal to order production of the drafts was harmless error. Agent Mitchell testified that the drafts and reports were the same. Similarly, Agent Moore testified that the only corrections he would make to a report were to code identifiers, distribution markings and to rectify spelling or grammatical errors. Since the information which could have been useful on cross-examination was contained in both the drafts and the reports, no substantial rights of defendant were prejudiced by his being given one but not the other. *United States v. Johnson*, 521 F.2d 1318 (9th Cir. 1975).

At the first hearing on remand, defense counsel objected to this method of making the harmless error determination because it based the conclusion on the testimony of the very witness whose credibility was to be challenged by use of the Jencks materials. This point would be well taken if Agent Mitchell alone had testified. We have, however, the corroborating evidence of Agent Moore who testified that no changes were made to the substance of the drafts. Agent Moore did not testify at the trial, so initially, his credibility is not in question. Moreover, defense counsel was given ample opportunity to cross-examine Agent Moore at the hearing on remand and no discrepancies were discovered. Finally, the stipulation of counsel (Docket Entry 50) as to the testimony of the secretary who typed the reports fails to disclose that any substantive changes were made when the drafts were typed.

We readily admit that a physical side by side comparison of the drafts and reports is the preferred method of making this determination, but under the circumstances such procedure was impossible. Neither the testimony of Agent Mitchell nor that of Agent Moore evidences any bad faith in the destruction of the drafts if that is, in fact, what happened. Therefore, the finding of harmless error is unaltered. *United States v. Vella*, 562 F.2d 275 (3d Cir. 1977), *cert. denied*, 434 U.S. 1074, 98 S.Ct. 1262, 55 L.Ed.2d 779 (1978). This conclusion is buttressed by the apparent willingness of the government to produce the drafts at trial if the Court so required.

In view of the foregoing, the Court finds that the handwritten drafts of Agent Mitchell were "statements" within the meaning of the Jencks Act. Further, it appearing that substantially identical statements were provided to defense counsel by the final reports, the Court finds its failure to order disclosure of the drafts was harmless error.

Since the Court of Appeals has retained jurisdiction over this appeal, the case shall now be returned to that Court for final consideration.